IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TERRY LANE,                                    3:13-CV-01470-BR

       Plaintiff,                              OPINION AND ORDER

v.

INGERSOLL-RAND COMPANY d/b/a
BOBCAT OF PORTLAND,

       Defendant.


**ERIC D. VIRSHBO**
**MELANIE E. ROSE**
MacMillan Scholz & Marks, PC
900 S.W. Fifth Avenue, Suite 1800
Portland, OR 97204
(503) 224-2165

       Attorneys for Plaintiff

**JEFFREY S. EDEN**
**JORDAN R. SILK**
Schwabe Williamson & Wyatt, PC
1600-1900 Pacwest Center
1211 S.W. Fifth Avenue
Portland, OR 97204
(503) 796-2837

       Attorneys for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant's Motion (#17) for Summary Judgment.  The Court concludes the record is sufficiently developed such that oral argument would not be helpful.  For the reasons that follow, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion.


<u>BACKGROUND</u>

The following facts are undisputed unless otherwise noted.

In June 2000 Defendant Ingersoll-Rand manufactured the "DD-16 Serial Number 164566 Asphalt Compactor" (the drum roller).  Initially the drum roller was put into service as part of a fleet of rental equipment in San Diego, California, during which time the drum roller was used for a total of 157 service hours by an unknown number of renters.

On August 20, 2004, the drum roller was transferred to an unidentified dealer in Portland, Oregon.

On October 13, 2004, the Yamhill County Public Works Department purchased the drum roller from the dealer.  The record reflects the drum roller had accrued a total of 774 service hours at the time of the incident at issue in this matter.

In 2006 the Yamhill County Public Works Department hired Plaintiff Terry Lane as a utility worker.  The record reflects Plaintiff used the drum roller for at least 105 hours from April

2 - OPINION AND ORDER

2006 through October 2010.  Each time Plaintiff operated the drum roller he used "the grab handle on the pedestal" to climb onto the drum roller.  Plaintiff stated at deposition he did not notice at any of those times that "the handle was loose or unstable in any way."

On June 23, 2011, Plaintiff was injured when he attempted to climb onto the drum machine:

> I had grabbed the handle, um, stepped into the stirrup to get on, and then pulled myself up.  I remember falling backwards and, um, with the handle still in my hand.  Uh, and I jabbed this leg into the ground — it was really, it was pretty hard and I just — as soon  as it happened I said ouch or something.

Decl. of Jordan Silk, Ex. C at 8.  Plaintiff's coworkers took him to the hospital.

Yamhill County employees at the scene took six photographs of the drum roller and the drum-roller handle immediately following the incident.  Later on June 23, 2011, a Yamhill County maintenance worker, Daniel May, repaired the handle by rewelding it to the drum roller.  The parties do not dispute the rewelding eliminated all evidence of the condition of the drum roller when it failed other than the six photographs.

At some point after the incident Plaintiff sought and received workers' compensation benefits.

On June 21, 2013, Liberty Northwest Insurance Company commenced an action in Multnomah County Circuit Court in Lane's

3 - OPINION AND ORDER

name and against Defendant pursuant to Oregon Revised Statute
§ 656.591, which permits a workers' compensation "paying agency"
to bring an action in the employee's name, and asserted three
claims for relief:  (1) products liability, (2) breach of implied
warranty, and (3) negligence related to the design and
manufacture of the drum roller.

On August 21, 2013, Defendant removed the matter to this
Court on the basis of diversity jurisdiction.

On June 30, 2014, Defendant filed a Motion for Summary
Judgment as to all of Plaintiff's claims.  The Court took the
matter under advisement on August 7, 2014.


**STANDARDS**

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011).  *See also* Fed. R.
Civ. P. 56(a).  The moving party must show the absence of a
dispute as to a material fact. *Rivera v. Philip Morris, Inc.*,
395 F.3d 1142, 1146 (9th Cir. 2005).  In response to a properly
supported motion for summary judgment, the nonmoving party must
go beyond the pleadings and show there is a genuine dispute as to
a material fact for trial. *Id*.  "This burden is not a light one.
. . .  The non-moving party must do more than show there is some

4 - OPINION AND ORDER

'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010). "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citation omitted). A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller*

*Prod., Inc.*, 454 F.3d 975, 987 (9ᵗʰ Cir. 2006).  If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment.  *Id*.


## DISCUSSION

Defendant moves for summary judgment on the ground that the record lacks sufficient evidence for any reasonable juror to conclude that Defendant defectively manufactured or designed the handle of the drum roller.  In the alternative, Defendant asserts even if the record permits an inference of the existence of a defect in the handle, Yamhill County's repair of the handle significantly prejudiced Defendant's ability to defend this action.  Defendant, therefore, contends the Court should grant summary judgment in favor of Defendant as a sanction for spoilage of the evidence.

**I.   Competing expert evidence to which there is no objection.**

Defendant relies on the opinions of its experts, John T. Myers III and Frank Martinelli, to support its Motion for Summary Judgment.  Plaintiff relies on the opinion of his expert, Keith Cronath, to support his position.  Neither party objects to the qualifications of the experts.

On March 28, 2014, Myers rendered an expert opinion as to the effect of the June 23, 2011, repair of the drum-roller handle on Defendant's ability to evaluate the cause of the incident.

After Myers examined the photographs of the handle taken after the incident but before the repair; the documentation of Yamhill County's purchase of the drum roller; and the documentation of the use of the roller by Yamhill County, including operator inspection reports, repair work orders, and an operator parts manual, Myers opined the presence of "a single bright zone" of fresh metal with "[t]he balance of the surface show[ing] evidence of rust on the surface of the sheet metal material and the edge of the weld" as seen in the photographs "suggest[s] some progressive failure occurred at the edge of the weld."  Silk Decl., Ex. J at 2.  Myers noted, however, that the photographs and other evidence did not provide sufficient evidence for him to formulate an opinion as to the initial cause of the progressive failure.  Specifically, Myers noted:

> Photographs taken post-repair show a substantial increase in the weld material all the way around the perimeter of the contact zone between the grab bar and the console.  The portion of the sheet metal side of the console adjacent to the weld retaining the grab bar has been completely covered by molten material from the welding activity. Given the size of the weld, it would be expected that substantially all of the internal physical evidence present at the failure has been completely obliterated by molten metal during the process of welding [that occurred in the process of Yamhill County's repair].
>
> If the reweld activity had been delayed long enough to allow detailed photographs and samples to be taken from the failure zone, it should have been possible to determine the location of the failure origin on each side of the console, the material conditions at the location where failure

originated, and the progressive character of the failure.  Testing conducted on samples removed from the failed unit would probably have been a basis for determining the forces which acted on the grab bar at the time the failure originated and during its progress from initiation to final separation.  Detailed photographs of the fracture surfaces at the exterior of the weld and on the interior of the console sheet metal would also have been a basis for determining the magnitude and direction of forces when the last portion of the connection failed.  The process used in the original weld, including the rate of metal deposit, the alloy material used in the metal deposit, the geometry and the heat input used in the welding process could probably have been determined based on cross sections of the weld zone and the materials adjacent to the weld.  The weld repair work which has been done has probably made all those determinations impossible.

[Although Defendant] has internal records showing the materials used and the weld processes specified, the weld repair has made it impossible to determine whether the original welding done on this particular machine was done in accordance with the specifications or whether some variation occurred.

* * *

The weld repair [makes it impossible] to determin[e] the cause of failure. . . .  The fact of a failure does not of itself demonstrate or prove the existence of a defect.  Failure of machinery will occur when machinery is abused or misused.  It will also occur when machinery is altered.  Abuse, misuse or alteration might have been determinable prior to the weld repair.  No conclusive determination with respect to those conditions can be made at this time.  Without being able to make those determinations, it is not possible for the cause of the failure to be determined to a degree which denies abuse, misuse or overload.

Silk Decl., Ex. J at 3-6.

8 - OPINION AND ORDER

On April 2, 2014, Plaintiff's expert, Keith Cronrath, submitted a report in which he noted he did not examine the handle before the repairs were made, but he reviewed the photographs of the handle taken before the repairs were made. Cronrath noted

> [n]o permanent deformation (bending) of the grab handle tube or the pedestal sheet metal could be observed in the photographs. The absence of any observable permanent deformation of either the grab handle tube or the pedestal sheet metal indicates that prior to the final fracture . . . the yield strength of the grab handle steel and the pedestal sheet metal was never reached.

Silk Decl., Ex. K at 3. Cronrath, however, conceded "[t]he actual features of the fracture surfaces could not be observed due to the quality of the photographs." Silk Decl., Ex. K at 3. Despite that limitation, Cronrath opined "[t]he fact that the pedestal sheet metal and the grab handle tube did not have evidence of stresses exceeding their yield strength leads to the reasonable conclusion that the fractures on both sides of the pedestal grab handle attachment points were fatigue type failures" that resulted solely from foreseeable day-to-day use of the handle. Cronrath defines "fatigue-type failures" as "cracks that occur over time as metal is cyclically loaded." Silk Decl., Ex. K at 3-4. Ultimately Cronrath concluded

> [t]he fatigue crack on both sides of the pedestal most probably formed due to insufficient strength designed in to the connection of the grab handle to the pedestal. If the connection of the grab handle to the pedestal had been designed and

9 - OPINION AND ORDER

> tested sufficiently this failure would not have
> occurred. . . .  The design of the attachment of
> the pedestal grab handle to the pedestal was
> defective.

Silk Decl., Ex. K at 4.

To rebut Cronrath's report, Defendant relies on a report by

Martinelli and a second report by Myers.  Martinelli stated in

his report that in April 2014 he conducted testing on a handle of

the same model of drum roller as that involved in the June 23,

2011, incident.  Using field testing and a computer simulation

that interpreted the data gleaned from the field testing via

structural finite element analysis, Martinelli concluded "the

handhold-to-pedestal weld joint should not fail (fracture/break

off) within 6000 hours of operation."  Silk Decl., Ex. L at 1.

In particular, the weld joint on the handle as designed could

withstand 6000 hours of foreseeable day-to-day stress without

failing.

In Myers's second report submitted on April 25, 2014, he

states he could not reach any reasonable conclusion as to the

root cause or mechanism of the handle's failure based on the

available evidence:

> The actual details of the failure mechanism which
> occurred on this machine cannot be determined at
> this time.  All of the evidence which would be a
> basis for a conclusion or determination about the
> origin of the fracture, whether it was fatigue or
> the rate of progress of the fracture, were
> obscured.  The origin and geometry, the stresses
> involved in the initiation, and the advance rate
> of the fracture have been completely obscured by

> the owner's decision to repair the machine by
> welding over the crack on the same day the event
> occurred.  It is not possible at this time for the
> manufacturer to determine the specific cause of
> the failure.  It is also not possible at this time
> for another expert to determine the cause of this
> failure.

Silk Decl., Ex. M at 2.  Myers addressed Cronrath's assertion

that the absence of any observable permanent deformation of the

handle tube or the pedestal sheet metal indicated the yield

strength of the grab-handle steel and the pedestal sheet metal

was not reached before the final fracture:

> All of the photographs showing the sheet metal of
> the pedestal are taken looking directly at the
> face of the sheet metal.  Distortion of the sheet
> metal as a result of overstress at the welded
> connection of the handle would result in movement
> of the sheet metal perpendicular to the face of
> the sheet.  Such movement would have to be gross,
> and involve some wrinkling of the sheet metal, to
> be easily determined in a photograph looking
> straight on.  The lack of visual evidence in these
> photographs is not a basis for concluding there
> was no distortion of the sheet metal of the
> pedestal.  If the machine had been made available
> for inspection after the failure and before the
> repair, it would be possible to make such a
> determination.  It is not possible to make that
> determination now and it is not possible to assert
> that determination to a reasonable degree of
> engineering probability based on the photographic
> evidence.

Silk Decl., Ex. M at 3.  Myers once again concluded there is not

any "currently available physical evidence of a fatigue failure"

nor any "currently available evidence on which to base a denial

that abuse, misuse, or overload of the handle connection was the

cause of failure."  Silk Decl., Ex. M at 4-5.

11 - OPINION AND ORDER

## II.  Cronrath's second report to which Defendant objects.

On June 19, 2014, Cronrath submitted a second report and opinion.  Defendant asserts Cronrath's second report and opinion are untimely, and, therefore, the Court should not consider them.

### A.   Background

On October 24, 2013, the Court held a Rule 16 conference and issued an Order setting the deadlines for discovery in this matter.  Among other things, the Court ordered the parties to "complet[e] all discovery, including expert discovery," by June 27, 2014.  The Court, however, directed the parties "to set their own expert disclosure deadlines."

The parties conferred about expert-disclosure deadlines after the Rule 16 conference and agreed they would serve initial expert disclosures on April 4, 2014; responses on April 25, 2014; and rebuttal reports, if any, on May 9, 2014.  Plaintiff and Defendant served timely initial expert disclosures on April 4, 2014.  Defendant served timely response reports on April 25, 2014.

On June 19, 2014, almost six weeks after the deadline for serving rebuttal reports and one week before the close of all discovery, Plaintiff emailed defense counsel a second report drafted by Cronrath.

### B.   Analysis

Defendant asserts Plaintiff may not rely on Cronrath's

second report on the ground that it is untimely and the Ninth
Circuit has held courts should preclude the use of untimely
expert disclosures pursuant to Federal Rule of Civil Procedure
37(c)(1). *See Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259
F.3d 1101, 1106 (9th Cir. 2001). Federal Rule of Civil Procedure
37(c)(1) provides in pertinent part:

> If a party fails to provide information . . . as
> required by Rule 26(a) or (e), the party is not
> allowed to use that information . . . to supply
> evidence on a motion . . . unless the failure was
> substantially justified or is harmless.

Although the Ninth Circuit generally reviews discovery sanctions
levied by trial courts for an abuse of discretion, it gives
"particularly wide latitude to the district court's discretion to
issue sanctions under Rule 37(c)(1)." 259 F.3d at 1106.

        Plaintiff concedes in his Response that Cronrath's
second report was untimely. Plaintiff also states he cannot
explain why Cronrath's second report was not obtained and/or
provided to Defendant by the deadline because the attorney who
was responsible for the report is no longer with Plaintiff's law
firm. Plaintiff, therefore, has not provided the Court with any
explanation for his untimely submission of Cronrath's second
report. Defendant also asserts it has been prejudiced by the
late submission of Cronrath's second report because Plaintiff
provided the report to Defendant so close to the end of the
discovery deadline and so long after the time for expert

13 - OPINION AND ORDER

disclosures that Defendant had already made strategic decisions regarding expert depositions and expended significant resources preparing for summary judgment on the basis of the expert reports submitted before the deadline.

On this record the Court concludes Plaintiff has not presented any justification for his untimely production of Cronrath's second report, and, in addition, Defendant has established Plaintiff's untimely submission of the report was not harmless. Accordingly, the Court, in the exercise of its discretion, excludes Cronrath's second report for purposes of summary judgment.

## III. Merits of Plaintiff's Products-Liability Claims

As noted, Plaintiff brings the following claims based on allegations of a manufacturing or design defect in the handle of the drum roller: (1) products liability, (2) breach of implied warranty, and (3) negligence. It is undisputed that the factual bases on which Plaintiff brings his implied warranty and negligence claims are the same as those on which Plaintiff's products-liability claim rests.

Although Plaintiff does not set out the legal basis for his products-liability claim in his Complaint, it appears Plaintiff brings that claim pursuant to Oregon Revised Statute § 30.920(1), which provides:

> (1) One who sells or leases any product in a
> defective condition unreasonably dangerous to the

user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition, if:

> (a)  The seller or lessor is engaged in the business of selling or leasing such a product; and

> (b)  The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased.

Oregon Revised Statute § 30.900(1) provides:

> As used in ORS 30.900 to 30.920, "product liability civil action" means a civil action brought against a manufacturer . . . of a product for damages for personal injury . . . arising out of:

> > (1)  Any design, inspection, testing, manufacturing or other defect in a product.

Oregon courts have held § 30.900 "embraces all theories a plaintiff can claim in an action based on a product defect," *Kambury v. DaimlerChrysler Corp.*, 185 Or. App. 635, 639 (2003), including, but not limited to, claims based on theories of negligence and strict liability.  *Simonsen v. Ford Motor Co.,* 196 Or. App. 460, 466 (2005).  Accordingly, all of Plaintiff's claims must be brought pursuant to §§ 30.900-30.920, Oregon's product-liability statutes.

**A.    Design of the Handle**

Defendant asserts Cronrath's (timely) opinion and report are partly based on speculation because the available evidence does not fully support his conclusions as to the handle

15 - OPINION AND ORDER

design.  To support its assertion Defendant relies on the
opinions of Myers and Martinelli and specifically on Myers's
conclusions that there is not any "currently available physical
evidence of a fatigue failure" nor any "currently available
evidence on which to base a denial that abuse, misuse, or
overload of the handle connection was the cause of failure."  The
Court concludes, however, that Defendant's argument goes to the
weight of Plaintiff's evidence as to the issue of the handle
design.  The issues that Defendant raises in regard to Cronrath's
opinion as to the design of the handle are the kinds of issues
that Defendant can examine and question Cronrath about at trial.
The Court, therefore, concludes on this record that Plaintiff has
produced evidence sufficient to establish that a genuine dispute
of material fact exists as to the handle design.

        Accordingly, the Court declines to grant Defendant's
Motion for Summary Judgment as to the handle design.

        **B.    Manufacture of the Handle**

        To establish a manufacturing defect in the drum-roller
handle, Plaintiff has the burden to prove that the handle failed
to conform to Defendant's design specifications when it was
manufactured.  *See, e.g., Jones v. Gen. Motors Corp.*, 139 Or.
App. 244, 261 (1996)(An element of a plaintiff's *prima facie* case
for a manufacturing defect under Oregon Revised Statute
§ 30.920(1) is that the product was in a defective condition when

16 – OPINION AND ORDER

it left the defendant's control.).

Defendant points out that Cronrath does not opine anywhere in his report that the evidence suggests a defect in the manufacture of the handle. Specifically, Cronrath opines only that "the fatigue fractures in the pedestal sheet metal adjacent to the grab handle weld most probably could have been prevented if the structure of the attachment of the grab handle to the pedestal sheet metal had been properly *designed* . . . to withstand any reasonable foreseeable forces during the [roller's] use." Silk Decl., Ex. K at 1 (emphasis added). Cronrath further stated "[t]he fatigue crack on both sides of the pedestal most probably formed due to insufficient strength *designed* into the connection of the grab handle to the pedestal." Silk Decl., Ex. K at 4 (emphasis added). Cronrath does not offer any opinion as to the manufacture of the handle.

In addition, the record reflects the drum roller was used by multiple operators between the time of the manufacture of the drum roller in 2000 and the time of the incident in 2011. Specifically, during the 157 service hours it was used by the rental company, the drum roller was operated by unknown individuals in an unknown manner, which, according to Defendant, means a fact-finder could not determine without speculating whether the problem with the handle was the result of a manufacturing defect or the result of abuse or misuse of the drum

17 - OPINION AND ORDER

roller.

The Court, therefore, concludes on this record that Plaintiff has not established a genuine dispute of material fact exists as to the manufacture of the drum-roller handle.

Accordingly, the Court grants Defendant's Motion for Summary Judgment as to the portion of Plaintiff's claims based on the manufacture of the drum-roller handle.

**IV. Spoilage of the evidence.**

Even if the Court concludes a genuine dispute of material fact exists as to the design or manufacture of the drum-roller handle, Defendant asserts the Court should, nevertheless, grant summary judgment in favor of Defendant as a sanction for spoilage of the evidence.

It is undisputed that Yamhill County employee Daniel May repaired the drum handle on the day of the incident before any of the experts in this matter had a chance to examine it. It is also undisputed that the repair of the handle impaired the experts' ability to evaluate and to opine more definitively as to what caused the handle to break. As noted, Defendant asserts the Court should grant summary judgment in favor of Defendant as a sanction for spoilation of the evidence.

"'A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation of evidence.'" *Med. Lab. Mgmt.*

*Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 824 (9th Cir. 2002)(quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).  The Ninth Circuit has recognized a district court has broad discretion to make discovery and evidentiary rulings conducive to the conduct of a fair and orderly trial pursuant to its inherent powers.  *See, e.g., In re USA Commercial Mortg. Co.*, 462 F. App'x 677, 679 (9th Cir. 2011)(citations omitted); *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992).  The district court's inherent power "includes the power to sanction the responsible party" for failing to preserve material evidence.  *Med. Lab. Mgmt. Consultants*, 306 F.3d at 824.  Such a sanction may include dismissal of the case or exclusion of evidence.  *Erlandson v. Ford Motor Co.*, No. 08-CV-1137-BR, 2009 WL 3672898, at *3 (D. Or. Oct. 30, 2009) (citation omitted).  The Ninth Circuit has held

> [d]ismissal is an available sanction when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."

*Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (quoting *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995)).  "A finding of 'willfulness, fault, or bad faith' is required for dismissal to be proper." *Leon*, 464 F.3d at 958 (quoting *Anheuser-Busch*, 69 F.3d at 348).  "A party's

19 - OPINION AND ORDER

destruction of evidence qualifies as willful spoliation if the party has 'some notice that the documents were potentially relevant to the litigation before they were destroyed.'"   *Id.* (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002)).

Plaintiff points out that Terry Lane is the plaintiff in this matter, and there is not any evidence that Lane destroyed the evidence at issue, that he was a motivating factor in the destruction of evidence, or that he played any part in the destruction of evidence.  Plaintiff also notes in his Response that all of the cases on which Defendant relies for its spoliation argument involved *parties* who spoiled the evidence, and Daniel May and Yamhill County are not parties to this action. According to Plaintiff, therefore, Defendant's cases are inapplicable to the circumstances of this case.

In addition, the record does not reflect May had any indication that the drum-roller handle was relevant to any litigation before he repaired it.  In fact, the record reflects May repaired the drum roller in the course of a regular work day with the intent to get the drum roller working and back into service.

Although Defendant concedes Lane did not have anything to do with the destruction of evidence, Defendant notes this matter is a workers' compensation subrogation action and, therefore, the

actual real party-in-interest is Liberty Northwest Insurance
Company because it is Yamhill County's workers' compensation
insurance carrier and Lane is Plaintiff in name only even though
he has a limited interest in this matter to the extent that there
is any surplus recovery.  Defendant asserts the insurer-insured
relationship between Liberty and Yamhill County imposed a duty on
Yamhill County to "assist [its] insurer in processing claims."
Or. Rev. Stat. § 656.262.  Defendant also points out this action
arose out of Lane's on-the-job injury, and "[t]here can be no
dispute that both Yamhill County and Liberty . . . are aware that
an on-the-job injury will potentially, if not certainly, result
in a workers' compensation claim under Oregon's statutory
workers' compensation system, and that such a claim may give
rise, in turn, to a third-party claim such as" this matter.
According to Defendant, therefore, it follows that Lane's injury

> gave notice to Yamhill County and, in turn, to
> Liberty, of a potential third-party claim against
> the manufacturer of the equipment that apparently
> had caused that injury. . . .  Despite that
> notice, Yamhill County personnel proceeded to
> repair the handle immediately. . . .  That is,
> Yamhill County and Liberty apparently failed to
> implement policies or otherwise inform Yamhill
> County's employee agents of their obligation to
> preserve evidence associated with workers'
> compensation claims. . . .  In light of Yamhill
> County's and Liberty's knowledge of the
> possibility of a third-party claim in this case,
> their failure to take steps to ensure that Yamhill
> County employees preserved relevant evidence
> created a foreseeable risk that such evidence
> would not be preserved . . . [and] Yamhill County
> and Liberty negligently allowed the handle to be

21 - OPINION AND ORDER

> completely repaired. Liberty has wilfully
> spoliated evidence.

Def.'s Mot. for Summary J. at 26.

The Court, however, finds Defendant's spoilation argument is attenuated at best.  It is undisputed that Lane and Liberty did not destroy the evidence, and there is not any indication that either of them "engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" when May repaired the handle.  Thus, the circumstances that led to the destruction of evidence here differ markedly from those in which the Ninth Circuit concluded dismissal of an action was a reasonable sanction for spoilation.  For example, in *Leon* the plaintiff knew he was required to preserve all data on his employer-issued laptop, but he intentionally deleted many files and then wrote a program to write over the deleted documents. 464 F.3d at 959.  The plaintiff admitted he intended to destroy information and that he had "ample notice" that the files he destroyed were relevant to the litigation.  Specifically, the plaintiff "ran the wiping program, eliminating over 2,200 files, including pornographic files, well after [the defendant] had filed its action for declaratory judgment and [the plaintiff] had filed his own employment discrimination action."  *Id.*

In addition, the existence of the secondary evidence of the photographs in this case lessens the prejudice caused by the destruction of the handle.  *See Med. Lab. Mgmt. Consultants*, 306

22 – OPINION AND ORDER

F.3d 806, 824 (9th Cir. 2002).

Accordingly, on this record and in the exercise of its discretion, the Court declines to grant summary judgment to Defendant as a sanction for spoilation of evidence when Yamhill County inadvertently destroyed the evidence.[1]

**CONCLUSION**

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendant's Motion (#17) for Summary Judgment.

IT IS SO ORDERED.

DATED this 16th day of September, 2014.

/s/ Anna J. Brown

_____

ANNA J. BROWN
United States District Judge

_____

[1] The Court reserves for trial the question whether a spoilation instruction should be given to the jury.

23 - OPINION AND ORDER